## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JEFFREY E. PERELMAN**, in his individual capacity and as Trustee of the Alison R. Perelman Trust, **1 Cherry Lane Wynnewood, PA 19096** **FRANK KATZ, 1 Huntington Avenue, # 1002 Boston, MA 02166** in his capacity as Trustee of the Alison R. Perelman Trust, and **JEP MANAGEMENT, INC.,** a Delaware corporation, 101 H. Cherry Lane Wynnewood, PA 19096 Plaintiffs, v. **RAYMOND G. PERELMAN,** 965 N. Ocean Blvd. Palm Beach, FL 33480 Defendant. | Civil Action No. |

## COMPLAINT

Plaintiffs Jeffrey E. Perelman ("Jeffrey") in his individual capacity, JEP Management, Inc. ("JEP"), and Jeffrey E. Perelman and Frank Katz ("Katz") in their capacity as Trustees of the Alison R. Perelman Trust f/k/a Jeffrey E. Perelman Trust (hereinafter "the Trust"), by and through their undersigned

counsel, bring this complaint for declaratory relief against defendant Raymond G. Perelman ("Raymond"), and in support thereof allege as follows.

## I. Preliminary Statement

Despite the profile he has garnered through his enormous charitable and philanthropic contributions over the years to benefit the community at large, Raymond Perelman has now, in the twilight of his life, elected to engage in a vicious course of conduct directed against his son that is unspeakable, incredibly embarrassing to both the family and a very prominent and distinguished member of the Philadelphia legal community, and utterly devoid of a factual basis or any connection to reality. The filing of this lawsuit is necessitated by the misguided and disturbing actions of a father bent on destroying his son's reputation in the business and philanthropic communities. As is more fully set forth herein, Raymond has falsely accused his son, Jeffrey, of fraudulent and deceptive conduct in connection with a series of transactions that occurred almost twenty years ago. At the time of those transactions, Raymond was represented by a team of in-house and outside counsel, who exchanged multiple drafts of the agreements that Raymond now claims are tainted by fraud. For all of the reasons set forth herein, Raymond has no viable claims to pursue, no standing to commence a lawsuit based on the underlying events concerning the establishment of a trust, and is otherwise precluded from pursuit of any claims based upon well settled legal doctrines. Raymond's

2

threats of initiating litigation against Jeffrey have been ongoing for several years, although over the last few months the threats have significantly increased and have been publicized by him to friends, family and others in the community. Disturbed and weary of the constant and impending threat of frivolous and embarrassing litigation, Jeffrey is left in the unfortunate position of instituting litigation against his father for the purpose of seeking a declaratory judgment that Raymond has no basis to pursue claims against him.

## II. The Parties

1. Plaintiff Jeffrey is a citizen of the Commonwealth of Pennsylvania, residing in Pennsylvania. Jeffrey brings suit both in his individual capacity and in his capacity as Trustee for the Trust. Jeffrey is the son of Defendant Raymond Perelman.

2. Plaintiff Katz is a citizen of the Commonwealth of Massachusetts, residing in Massachusetts. Katz brings this suit solely in his capacity as Trustee of the Trust.

3. JEP is a corporation organized and existing under the laws of the State of Delaware having its principal place of business in Wynnewood, Pennsylvania.

4. Defendant Raymond is a citizen of the State of Florida, residing at 965 N. Ocean Blvd., Palm Beach, FL. Raymond is Jeffrey's father, and is a

well-known Philadelphia-area businessman with an array of business interests in the manufacturing, mining and financial industries.

## III. Jurisdiction and Venue

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and involves citizens of different states.

6. Venue lies in this court because a substantial part of the events or alleged omissions giving rise to the claim occurred in this district, and/or a substantial part of the property that is the subject of the action is situated in this district.

## IV. Background: Events Leading up to the Asset and Stock Purchase Agreements and the Creation of the Trust.

### a) Jeffrey's Employment with Raymond's Companies.

7. In the 1980's, Jeffrey was an officer of various companies, including but not limited to Belmont Industries, Inc. ("Belmont") and General Refractories, Inc. ("GFI"). Jeffrey was also employed by and performed services for a number of related companies. Raymond was the ultimate owner of the companies, either directly or indirectly through a trust. Over the years of his employment, Jeffrey became disillusioned with the circumstances of his employment, principally as a result of what was already a badly deteriorated relationship with Raymond.

8.     In 1987, Raymond formed a grantor trust for which he served as sole trustee and the sole beneficiary. Either directly , or indirectly through that trust, Raymond was the sole owner of and controlled a number of the companies, including Belmont and GFI.

9.     Those corporations in turn owned a second group of companies, including Den-Tal-Ez, Inc.; Den-Tal-Ez Dental products (GB) ltd.; Productos Dentales Dentalmex – S.A. de C.V.; Star Dental de Mexico, S.A. de C.V.; Schiller-Pfeiffer, Inc.; Schiller Machine Shop; General Machine Corporation; United Ammunition Container Corp.; Reliance Grating Company, Inc.; Reliance Steel Products; Reliance Steel International Ltd.; NuContainer Corp.; Dynamic Products Corp.; and Little Wonder International (collectively, the "Purchased Companies").

10.     Raymond was also the CEO or other officer, as well as a director, of Belmont, GFI and each of the Purchased Companies.

**b)     Jeffrey's Unexpected Departure from Raymond's Companies and Judge Adams' Efforts to Reunite the Family.**

11.     Due to escalating business and personal conflicts with Raymond, in 1989, Jeffrey unexpectedly resigned from employment at Raymond's companies, took his family to Colorado and severed his relationship with Raymond.

12.     Jeffrey's decision had a severe impact on his mother, Ruth Perelman. In an effort to establish family harmony, Ruth Perelman contacted a longtime family friend and trusted advisor, Arlin Adams, in 1989, shortly after Jeffrey's departure, to see if he could negotiate an agreement to restore tranquility in the family and have Jeffrey return to the family business. Judge Adams is a former member of the United States Court of Appeals for the Third Circuit, who had recently retired in 1987. His close relationship with all of the family members, coupled with the enormous respect and distinguished reputation he enjoys in the legal community, were the motivating factors in the decision to involve him in the process to negotiate a family truce.

13.     Over the course of the ensuing months, Judge Adams worked tirelessly to reach an accord between Jeffrey and Raymond. The essence of the discussions centered around Jeffrey's return to the family businesses predicated upon the sale to Jeffrey of a series of companies then owned and controlled by Raymond. As is more fully set forth herein, Raymond identified three concerns regarding how to structure the transactions: a) First and foremost, Raymond wanted to be certain he would incur no tax obligations of any kind as a result of the sale of the businesses; b) second, Raymond wanted Jeffrey's wife to renounce any interest that she might have in certain assets contemplated to be transferred into the trust mentioned in part (c); and c) Raymond wanted 50% of the assets or stocks transferred in connection with the transactions to be

133218.00601/21824678v.2                    6

placed in a trust for the ultimate benefit of Jeffrey's daughter, who was seven years old at the time, and any other children Jeffrey might have, but insuring that Raymond incur no taxes, including without limitation gift, generation-skipping and capital gains taxes. It was also important that the transaction be structured in such a way that Jeffrey would incur no gift taxes.

c) **The Negotiations that Culminated in the Asset and Stock Purchase Agreements and the Agreement of Trust.**

14. Through Judge Adams's efforts, negotiations continued in the late summer through the fall of 1989 to determine how the parties would structure the transaction in a way to minimize if not eliminate any potential gift, generation-skipping and capital gains taxes or other unnecessary adverse tax consequences to Raymond that might result from the stock and asset transfers.

15. Raymond and Jeffrey jointly retained the law firm of Schnader, Harrison Segal & Lewis ("Schnader") to facilitate the transfer of the companies, including the related financing, and in January 1990 signed a waiver of any conflicts associated with that joint representation.

16. At the time of these negotiations, Raymond owned many companies conservatively estimated to be worth at the time hundreds of millions of dollars. In addition to his attorneys at the Schnader firm, Raymond had a team of in-house counsel who were intimately familiar with asset and

stock acquisition agreements, the formation of trusts and the tax issues that arise from such transactions.

17.     In January 1990, Raymond agreed to sell to Jeffrey, and Jeffrey agreed to purchase, all the stock or all of the assets of the Purchased Companies.    As consideration for the transactions, Jeffrey agreed to pay approximately $27 million, and assumed significant liabilities of the Purchased Companies such as environmental and other liabilities.  The purchase price was negotiated at arm's length over a number of months, and Raymond and Jeffrey agreed that the purchase price was equal to the full fair market value of the businesses sold.  Raymond and Jeffrey believed there would be no gift tax imposed on Raymond as a result of the sale.

18.     Raymond and Jeffrey ultimately negotiated and executed a series of twelve Asset Purchase Agreements and Stock Purchase Agreements (collectively "the Purchase Agreements") in which the assets or stock of the Purchased Companies were sold for approximately $27 million.

19.     In an effort to address the concerns identified by Raymond as such are set forth in Paragraph 13 hereinabove, stock and assets representing half of the ownership of the Purchased Companies was placed by Jeffrey into an irrevocable trust, then known as the Jeffrey E. Perelman Trust.  Jeffrey received no consideration for this transfer.  As more fully set forth in ¶ 71 below, the Trust was subsequently renamed, almost twenty years later, the

133218.00601/21824678v.2                    8

Alison R. Perelman Trust for the reasons explained in that paragraph. By the express terms of the Agreement of Trust, Judge Adams and Jeffrey were designated co-Trustees of the Trust. Judge Adams was a signatory to the Agreement of Trust and served as Trustee from the inception of the Trust until December 2008, at which time Plaintiff Katz took his place. From its inception, Jeffrey has been a Trustee.

20.    To pay the purchase price, Jeffrey borrowed approximately $25 million (the "Loan") from Provident National Bank ("Provident") and Meridian Bank ("Meridian").

21.    As security for the Loan, Jeffrey individually and as co-Trustee of the Trust pledged to Provident and Meridian all of the assets and stock of the Purchased Companies and the stock of the companies he had formed for purposes of the acquisition. The purchase price was used by Raymond to retire certain debts of the Purchased Companies that were liabilities Raymond would otherwise have retained following the sale of the Purchased Companies and certain debts of Belmont, a company Raymond owned and controlled.

## V.    The Tax and Other Considerations That Influenced the Structure of the Trust.

22.    As set forth more fully in Section VIII below, Raymond now claims, almost twenty years after the consummation of the transactions, that he was misled and defrauded by his son and others regarding the structural

133218.00601/21824678v.2                          9

organization of the Trust. He now claims belatedly that he expected the Trust to be established with Jeffrey's daughter and the daughter's future issue as the sole beneficiaries, and that all of the income of the Trust for the last 20 years should have remained in the Trust for them. Separate and apart from the fact that he and his team of lawyers reviewed the Agreement of Trust before it was signed, and that the clear and unambiguous provisions of the Agreement of Trust state that Jeffrey is the beneficiary during his lifetime and has the right to control the income in the Trust, Raymond's claims defy common sense: Such a transfer to or for the direct benefit of a then seven-year-old child not only would have been nonsensical, it would have triggered exactly what Raymond himself did not want -- the risk of large gift and generation-skipping transfer taxes if the Internal Revenue Service determined that the purchase price was insufficient and that the sale to Jeffrey had been conditioned upon a gift of half the assets to such a trust.

23.   In fact, to insure that Raymond avoided any tax consequences, the terms and conditions of the Trust were carefully and meticulously drafted by the Schnader attorneys. Upon information and belief, Raymond never incurred any gift, generation skipping or capital gains taxes as a result of the Purchase Agreements with Jeffrey and Agreement of Trust.

24.   Raymond also now claims belatedly that he knew nothing about JEP, which he asserts has been used as the instrumentality to perpetrate a

133218.00601/21824678v.2                          10

"fraud" that Raymond has concocted in his attempt to distort and recreate history. As is more fully set forth herein, Raymond personally executed all of the necessary documents to consummate these transactions, including documents in which JEP was a party signatory. As mentioned below, JEP was used to address tax issues arising from "C" and "S" corporations, which were a central part of the underlying transactions.

25.     Raymond also now claims that he was misled and defrauded in connection with his daughter-in-law's renunciation of her interest in the assets transferred to the Trust. With respect to this component of the alleged "fraud," Raymond now claims falsely that his daughter-in-law was required to renounce in a post-nuptial agreement her interest in one hundred percent of the assets transferred, rather than the 50% that were transferred into the Trust at its formation. Simply put, that was never the deal.

26.     For the reasons more fully set forth below, there is no merit to these scandalous allegations.

a)     **Certain Provisions of the Trust that Raymond Now Complains About Were Necessary to Minimize Payment of Taxes.**

27.     Under the Agreement of Trust, Jeffrey retained the right to all trust income for his lifetime. Indeed, the Agreement of Trust specifically and explicitly states:

133218.00601/21824678v.2          11

> "[T]hroughout Settlor's [Jeffrey's] lifetime, Trustees
> shall pay to Jeffrey E. Perelman the income from the
> Trust in convenient installments, not less frequently
> than quarterly."

Despite this provision, and despite the fact that he controlled the dividend payments by the corporations, Jeffrey left a significant amount of the income over the years in the companies rather than having the dividends paid to the Trust, which would have resulted in income to be distributed to him directly.

28.    The Agreement of Trust also allowed Jeffrey the right to principal under certain specified circumstances, such as to be reimbursed for any income taxes he had to pay on capital gains income of the trust.  The Agreement of Trust explicitly states in pertinent part:

> 2.    In addition, Trustees may from time to time
> pay to, or expend for the benefit of, Settlor such
> amounts from the principal of the trust as Trustees,
> in their absolute discretion and without any request
> from Settlor, may deem appropriate to provide for
> Settlor's support, medical care, or maintenance or
> for the benefit of Settlor's children.

> 3.    In addition, Trustees shall pay to Settlor
> sufficient amounts of principal to satisfy any increase
> in the income tax obligation of Settlor by reason of
> his obligation to pay income taxes on trust principal
> in the event of a transaction giving rise to capital
> gain tax or any other type of tax on trust principal
> payable by Settlor.

29. The Agreement of Trust also contained limited power to appoint the principal of the trust on his death among a class consisting only of his issue and charities:

> SECOND . . . 1. Upon the death of JEFFREY E.
> PERELMAN, the principal of this trust as then
> constituted, including any undistributed income,
> shall be paid to or in trust for such one or more of
> the issue of Settlor and charitable organizations in
> such amounts or proportions as Settlor may appoint
> by his will by specific reference to this power of
> appointment. . . .

30. The Agreement of Trust also provided that if the power of appointment were not exercised, the principal would pass to Jeffrey's issue, "per stirpes," with the share of each of his children to be held in trust for the child's benefit, subject to a power in the child to withdraw all trust property at age 40.

31. At the time of the formation of the Agreement of Trust, Jeffrey had only one issue, his daughter. Raymond insisted that the Agreement of Trust be drafted to benefit any other issue that might be born thereafter. This structure was adopted after considering the potential tax risks to Raymond and to Jeffrey of several alternative structures in an effort to minimize or even eliminate any avoidable tax consequences and unnecessary tax risks of the stock and asset transfers.

32. Both Raymond and Jeffrey recognized that family transactions of this sort were often scrutinized by the IRS, that the stock and assets purchased were hard to value, and that if the IRS were to assert that Jeffrey paid less than fair market value for the property, Raymond could have been liable for a potentially large gift tax on the transfer to Jeffrey. Further, if Jeffrey had voluntarily transferred 50% of the stock to a trust without retaining sufficient controls, that transfer would have been treated as a completed gift, making Jeffrey himself liable for a potentially large gift tax.

33. Moreover, both recognized that if Raymond transferred any portion of the businesses directly to a trust for Jeffrey's daughter in which Jeffrey had no interest, or if Raymond required Jeffrey to make such a transfer as a condition of the sale, the amount of tax for which Raymond was at risk could more than double because generation-skipping transfer tax as well as gift tax would be owed on the excess, if any, of "fair market value" over the consideration paid, to the extent the amount exceeded Raymond's remaining generation skipping tax exemption.

34. During the course of the negotiations, the parties discussed the possibility of Raymond creating a trust for both Jeffrey and Jeffrey's issue. Raymond ultimately rejected the approach because there would have been no tax advantage: any such trust would have been subject to generation-skipping tax upon Jeffrey's death in an amount equal to or in excess of the estate tax that

would be paid on Jeffrey's death under the structure that was eventually settled upon, except to the extent that Raymond used his GST exemption on a gift to the trust.

35. The parties intended, and the Agreement of Trust so reflects, that Jeffrey would take outright ownership of half of the stock or assets of the Purchased Companies, and that the other half would be held in a trust for the benefit of Jeffrey during his lifetime and for Jeffrey's issue, including his daughter after his death.

36. If Jeffrey had transferred the stock and other assets to the Trust without retaining the ability to change the ultimate recipients, he could have been subject to significant gift tax on his transfers to the Trust.

**b) JEP's Role in the Transactions Was Open, Notorious and Also Necessary for Tax Purposes.**

37. At all material times relevant hereto, JEP was a "C" corporation.

38. At the time the Purchase Agreements were executed almost 20 years ago, corporations could not qualify as "S" corporations if they had any wholly-owned subsidiary.

39. Immediately following the consummation of the transactions under the Purchase Agreements, some of the purchased companies, which had wholly owned subsidiaries, were merged into "S" corporations that were formed by Jeffrey to be the purchasers under the Purchase Agreements.

40. To remain compliant with the prevailing law, it was necessary to transfer those wholly-owned subsidiaries to a "C" corporation. JEP was the "C" corporation used to consummate these transfers.

41. At all material times relevant hereto, Raymond knew about the implications of having wholly-owned subsidiaries in "S" corporations, and fully understood why JEP was a part of the transactions.

42. Raymond was also aware that JEP had been created to serve as the management company for the Purchased Companies.

43. JEP, in fact, was party to several, and the Trust itself was a party to one, of the twelve separate Purchase Agreements executed by Raymond at closing of the transactions.

44. On or about January 24, 1990, Jeffrey placed into the Trust 110 shares of the common stock of JEP (representing 50% ownership of JEP), as well as 50% of the shares of all of the companies he purchased from Raymond and 50% of the shares of the companies he formed to acquire the assets and stock from Raymond (collectively, the "Stock").

45. In short, Raymond knew about JEP and fully understood the necessity to involve JEP in the underlying transactions. His contentions now that JEP is an instrumentality used to perpetrate a fraud are plainly wrong.

c)   **The Daughter-in-Law's Renunciation of Her Interest
in the Assets Transferred into the Trust Was Properly
Done.**

46.    Jeffrey's retained interests in the Trust meant that his wife's rights

with respect to the trust property in the event of divorce or in the event of

Jeffrey's death would survive the transfer. Therefore, at the same time the

Purchase Agreements were being negotiated and the Agreement of Trust

prepared, Jeffrey entered into a post-nuptial agreement with his wife in which

she waived all rights to the Trust property in order to ensure that the Trust

property would benefit his children beginning no later than his death. His wife

was separately represented by counsel in those matters.

47.    The Trust was formed by an Agreement of Trust dated January

24, 1990, signed by Jeffrey as settlor of the Trust, and by Jeffrey and Judge

Adams, as the original co-Trustees. On the same date, a post nuptial

agreement was executed by Jeffrey and his wife in which, inter alia, his wife

relinquished her rights to the Trust property.

48.    Significantly, there was never any discussion about Jeffrey's wife

relinquishing her rights to one hundred percent of the assets and stock acquired

as a result of the Purchase Agreements. Raymond's belated and unseemly

allegations of "fraud" relating to his daughter-in-law's relinquishing of her

interests are likewise contradicted by a plethora of evidence which expose his

shameless fabrications.

## VI.  Raymond Reviewed Drafts of the Purchase Agreements and the Trust Agreement During the Course of Negotiations.

49.    From at least as early as 1989, Raymond was presented with the drafts of the Agreement of Trust, and the Agreement of Trust was discussed with Raymond several times by Judge Adams and Ray Page, who was at that time an estates attorney with the Schnader firm.

50.    For instance, by letter dated August 24, 1989, the Schnader firm provided a draft of the Agreement of Trust to both Raymond and Jeffrey. The cover letter forwarding the draft stated expressly that, during his lifetime, Jeffrey would receive the income from the Trust.

51.    By cover letter dated November 29, 1989, the Schnader firm again provided Raymond with a draft of the Agreement of Trust, which draft again clearly provided that Jeffrey would be entitled to receive income distributions from the Trust.

52.    The structure of the Trust – as a grantor Trust, with Jeffrey as Trustee and with him receiving distributions of income and a power of appointment – is similar in many ways to Raymond's own grantor trust, through which Raymond indirectly owned and controlled many of his businesses.

53.    In addition to the careful and considerable review by his in-house and outside counsel, Raymond was also shown drafts of the Purchase

Agreements throughout the negotiations leading up to the day these agreements were signed. As a savvy, sophisticated and successful businessman with almost 50 years of experience at the time, he fully understood the terms and conditions of each document.

## VII. Jeffrey's Efforts to Build the Businesses.

54.    Since 1990, following the closing of the transactions contemplated by the Purchase Agreements and the establishment of the Trust, Jeffrey worked diligently to build and grow the businesses.

55.    First, Jeffrey caused the Loan to be paid off in its entirety and has operated the Purchased Companies debt-free for more than sixteen years. This is in stark contrast to the state of the companies at the time of the transactions, when Raymond had caused the businesses to be stripped of cash and burdened with substantial debt.

56.    Second, through a disciplined and careful strategy, Jeffrey grew the businesses through strategic acquisitions, almost tripling the size of the businesses. For the past almost 20 years, fifty percent of the assets or stock of every acquisition except one has been placed into the Trust, even though the Agreement of Trust did not obligate Jeffrey to treat acquisitions in this manner.

57.    Through his business acumen and keen judgment, Jeffrey took relatively poor-performing companies and turned them into extremely profitable and well-respected business enterprises. The combined value of the

Purchased Companies, coupled with the acquisitions that were made thereafter, far exceeds the value of the companies at the time of acquisition in 1990. Thus, the value of the assets in the Trust has grown considerably over the years.

## VIII. Raymond's Baseless and Belated Threats to Sue Jeffrey.

58.    As Jeffrey became more successful in building the companies he acquired, Raymond became mired in jealousy and resentment over his son's success.

59.    In or about 2007, more than seventeen years after the sale of the Purchased Companies and the formation of the Trust, Raymond claimed to family members, friends and others that a) he did not know that Jeffrey had the right to receive income from the Trust during his lifetime, b) he expected Jeffrey's daughter to have ownership of the 50% of the stock and assets and/or to be the sole beneficiary of the Trust from its inception, c) either Jeffrey misled him about the structure of the Trust and the formation of JEP, or Jeffrey and/or JEP breached some promise or agreement with Raymond regarding the stock and assets, d) JEP was being used as an instrumentality to perpetrate fraud on the Trust; and e) Jeffrey's wife should have renounced all of her interests in all of the assets transferred, rather than the fifty percent transferred to the Trust.

60. Although each one bears his signature at least twice, both in his capacity as an officer of the sellers and in his capacity as the Trustee of his own grantor trust that owned the stock of the Purchased Companies, Raymond also claims that he never saw the twelve Purchase Agreements, much less signed them.

61. Raymond has repeatedly stated that he intends to file a lawsuit against Jeffrey for fraud and to destroy his reputation in the business community.

62. Raymond's claims are directly contradicted by an abundance of overwhelming evidence including the fact that Raymond actively participated in discussions concerning the structure of the Trust, was at all times given drafts of the Agreement of Trust by the Schnader firm, was also represented by a team of in-house counsel and by the parties' acknowledged desire to eliminate the risk of gift, generation-skipping and capital gains taxes. For reasons not readily or easily understood, Raymond ignores this evidence.

63. Further, none of the supposed promises, understandings or representations that form the bases for Raymond's complaints regarding the Trust and JEP was memorialized anywhere in *any* of the documents relating to the transactions. In fact, every one of the Purchase Agreements ultimately signed by Jeffrey and Raymond (in their individual capacities, in their capacity as officers of the companies on each side of the transactions, and in their

capacities as trustees of their respective trusts) contained an integration clause, disavowing the existence of any such extra-contractual promises.

64. Further, Raymond was represented by many lawyers in connection with the transactions with Jeffrey. Presumably, his lawyers documented the transactions in a manner that reflected the correct terms and conditions of the agreements.

65. Raymond and his counsel were also well aware that Jeffrey had created the "Jeffrey E. Perelman Trust." Simply by way of example, as shown by the image below, Raymond himself signed at least one document that Jeffrey and Judge Adams executed in their capacity as co-Trustees of the Trust.



IN WITNESS WHEREOF, this Agreement has been executed on the day and year first above written.

ATTEST: [CORPORATE SEAL]

Secretary

NEWTON TOOL & MANUFACTURING COMPANY

By: Raymond G. Perelman, Chairman

JEFFREY E. PERELMAN
THE JEFFREY E. PERELMAN TRUST

By: Jeffrey E. Perelman, Individually and as Trustee

By: Arlin M. Adams, Trustee

Agreed and Consented to by:

Belmont Industries, Inc., the sole shareholder of Newton Tool & Manufacturing Company.

By: Raymond G. Perelman, sole trustee and sole beneficiary of the Raymond G. Perelman Trust under deed of trust dated 10/20/87, as the sole shareholder of Belmont Industries, Inc.

-11-

66.    As a result, Raymond cannot now credibly contend that he was duped into thinking the Trust would be solely for Jeffrey's daughter. In fact, as noted above in ¶ 8, at the time of the transactions Raymond was the sole trustee and beneficiary of a grantor trust that was similar to this one. Familiar with these types of trusts, Raymond cannot now claim that he misunderstood the meaning and significance of the "Jeffrey E. Perelman Trust."

67.    Raymond also executed agreements in which JEP was a party, and thus cannot credibly argue he was unaware of the existence of JEP. He also signed all of the Purchase Agreements as well as supporting corporate documents, including board resolutions and certificates that were required in connection with the Loan from Provident and Meridian. Furthermore, the Board minutes for Belmont, in which Belmont approved the transactions, stated that all of the Purchase Agreements were on the table and available for review.

68.    Raymond's claims not only are directly contradicted by the record, as Raymond was informed of and participated in the structuring of the transactions and was given copies of the transactional documents at the time, but also defy common sense: Such a transfer to or for the direct benefit of a then seven-year-old child not only would have been nonsensical, it would have triggered exactly what Raymond himself did not want -- the risk of large gift and/or generation-skipping tax consequences.

69. Moreover, if the businesses were successful and Jeffrey had more children, a gift to Jeffrey's daughter of 50% of the business could have made it impossible for any future issue to be treated equally.

## IX. Jeffrey's Efforts to Resolve This Controversy Have Failed.

70. Jeffrey has attempted to resolve this family dispute amicably. In 2007, in response to his father's request, Jeffrey wrote off a total of $2 million that another one of Raymond's companies, Chayes Virginia, owed to several of Jeffrey's companies. His father then asked him to sign a document saying that the loans had never existed, something Jeffrey could not do since his companies and Raymond's had all carried the amounts on their respective financial statements. Jeffrey's companies took this $2 million write-off for tax purposes in 2007.

71. Further, in 2009 in the hopes of soothing his father, Jeffrey even went so far as to rename the Trust the Alison R. Perelman Trust, and changed the stock certificates to reflect that new name.

72. Jeffrey has also made other attempts to resolve the matter. Such attempts were made in accordance with Fed.R.Civ.P 408, and thus are not appropriate for disclosure in this pleading.

73. All the efforts to resolve the dispute have failed. As recently as October 2009, Raymond has repeatedly threatened suit against Jeffrey, JEP and/or the Trust, and has also made threats to smear Jeffrey in the local media.

74. Aware of her grandfather's threats of a lawsuit, Jeffrey's daughter rejects her grandfather's unfathomable behavior, and believes that any such lawsuit would be baseless and wrong.

75. Raymond persists, however, in claiming that he has the right to dictate – nearly two decades later, and after he and his retained companies have derived the full benefit of the stock and asset transfers – a fundamental alteration in the parties' agreements.

## X. The Trust Agreement was Set Up Precisely to Effectuate Raymond's Primary Concerns – Avoid Payment of Taxes.

76. All of Raymond's belated allegations about wrongdoing are without foundation. First, Jeffrey's daughter was not designated the named beneficiary of the Trust because it was intended that the trust would benefit all of Jeffrey's children, should he have any additional children. In addition, had Jeffrey's daughter been named as the only beneficiary, without Jeffrey's retention of a power to appoint the trust property to another person (such as a charitable organization), Jeffrey's transfer to the Trust could have been deemed a taxable gift to Jeffrey's daughter when he funded the trust, creating substantial tax obligations.

77. All of the corporations whose stock was owned by the trust, other than JEP, were "S" corporations for federal income tax purposes, and as such are entitled to certain favorable income tax treatment. The federal tax rules

provide that (a) only certain types of trusts are eligible to own "S" stock, and (b) if "S" stock is transferred to an ineligible trust, the "S" election is terminated.

78.    Had income been payable to Jeffrey's daughter upon formation, the Trust would have had to make a tax election to be an eligible "S" corporation shareholder unless certain other powers were retained by the trust's grantor or given to others (including Jeffrey's daughter). That would have caused the trust to be a so-called "grantor trust" and the trust property to be deemed owned, for federal income tax purposes, by the grantor or Jeffrey's daughter.

79.    By designating Jeffrey as the sole income beneficiary of the Trust during his lifetime, "S" status was assured whether the IRS ultimately treated Raymond or Jeffrey as the grantor of the Trust. If Jeffrey were treated as the true grantor, the Trust would be a grantor trust treated as owned by him for income tax purposes because of (a) his income interest and (b) his interest in and control over the principal of the Trust. If Raymond were treated as the true grantor, Jeffrey would be able to elect to treat the Trust as a QSST, the other kind of trust that was an eligible "S" shareholder.

80.    If these steps had not been taken and the Trust were deemed ineligible to be an "S" corporation shareholder, the corporations themselves would have lost the right to be taxed as "S" corporations.

81.   As noted in ¶ 47 above, from the Trust's inception in 1990 until December 31, 2008, Judge Adams served as co-Trustee. Although Plaintiff Katz has replaced Judge Adams as co-Trustee, Judge Adams remains a member of JEP's three-person Advisory Board.

82.   From time to time, Jeffrey and his daughter have spoken about the Trust and the possibility of her taking direct ownership of the companies. On every occasion, she has stated unequivocally that she does not want to own any part of the businesses.

83.   Jeffrey and his daughter also considered the possibility of having Jeffrey purchase her interest in the Trust outright, at a figure to be arrived at by an independent third-party, but she had and has no interest in pursuing any such transaction.

## Count I

## (Declaratory Judgment)

84.   Plaintiffs incorporate the foregoing allegations of this Complaint as if fully set forth herein.

85.   An actual controversy exists within the jurisdiction of this Court among Plaintiffs and Defendant regarding their respective legal rights and obligations relating to the Purchase Agreements and the Trust.

86.   Plaintiffs respectfully contend that the matter is appropriate for declaratory relief from the Court finding that Raymond is not entitled to

demand any amendments or changes to the Trust, or to change ownership of the Stock.

87.    Plaintiffs request that this Court exercise its authority vested by 28 U.S.C. § 2201 *et. seq.* to resolve these matters through entry of a declaratory judgment that, <u>inter</u> <u>alia</u>, (i) Raymond has no standing to pursue any claims against Jeffrey, the Trustees or the Trust relating to the formation and administration of the Trust; (ii) Raymond is barred based upon applicable statutes of limitations and other legal and equitable doctrines from pursuing any claims against Jeffrey, the Trustees or the Trust relating to the formation and administration of the Trust or the Asset or Stock Purchase Agreements; (iii) Raymond has no viable claims against Jeffrey, the Trustees or the Trust for any matter related to the formation and administration of the Trust or the Asset or Stock Purchase Agreements; and (iv) any other relief the Court deems just and equitable.

WHEREFORE, Plaintiffs JEP Management, Inc., Jeffrey E. Perelman in his individual capacity, and Jeffrey E. Perelman and Frank Katz in their capacity as co-Trustees of the Alison R. Perelman Trust, respectfully ask that this Court enter judgment in their favor and against Defendant Raymond Perelman, declaring the parties' rights and obligations, and award Plaintiffs costs and any further and additional relief that it may deem just and equitable.

Dated:       October 19, 2009          /s/ James T. Smith, Esquire
                                        BLANK ROME LLP
                                        A Pennsylvania LLP
                                        EDWARD CAHN
                                        JAMES T. SMITH
                                        REBECCA D. WARD
                                        One Logan Square
                                        Philadelphia, PA 19103
                                        (215) 569-5500

                                        Attorneys for Plaintiffs